David BULLOCH, McRae N. Bulloch, Kern Bulloch, Douglas Cory, A. C. Seegmiller, Myron Higbee, Nelson Webster, Lillian W. Clark, for herself and as representative of the estate of Douglas C. Clark, deceased, Lambeth Brothers Livestock, a partnership, T. Randall Adams, and Dee Evans, and John Does I through XX, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

David BULLOCH, McRae N. Bulloch, and Kern Bulloch, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Douglas CORRY, Plaintiff,

v.

The UNITED STATES of America, Defendant.

A. C. SEEGMILLER and Myron Higbee, doing business as Seegmiller & Higbee, a partnership, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Nelson WEBSTER, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Lillian W. CLARK, personal representative of the estate of Douglas C. Clark, deceased, Plaintiff,

v.

The UNITED STATES of America, Defendant.

LAMBETH BROTHERS LIVESTOCK, a partnership and T. Randall Adams, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Nos. C–81–0123C, C–19–55, C–22–55, C–23–55, C–26–55, C–27–55 and C–42–55.

United States District Court, D. Utah, C. D.

Aug. 4, 1982.

Dan S. Bushnell and Bruce Findlay of Kirton, McConkie & Bushnell, Salt Lake City, Utah, for plaintiffs.

Henry A. Gill, Jr., Sp. Atty., Civ. Div., Torts Branch, U. S. Dept. of Justice, and Ed Jiran, Trial Atty., U. S. Dept. of Energy, Washington, D. C. (J. Paul McGrath, Asst. Atty. Gen., Bruce E. Titus, Asst. Director, Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D. C., Brent D. Ward, U. S. Atty., and Ralph H. Johnson, Asst. U. S. Atty., D. Utah, Salt Lake City, Utah, with him on the briefs), for defendants.

CHRISTENSEN, Senior District Judge.

## MEMORANDUM, FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I MEMORANDUM

The first-entitled action, C–81–0123C, is an independent suit in equity, and the other enumerated actions involve motions in reliance upon Fed.R.Civ.P. 60(b)[1] to set aside the various 1956 judgments for alleged fraud upon this court. Duplication of effort or procedural problems of whether such a claim should be presented by an independent action or by motions in the original actions have been avoided at the outset by consolidation of all of the actions for the purposes of the present attack upon the prior judgments.

Following discovery proceedings, pretrial conferences, and the denial of motions for summary disposition of the claims of the plaintiffs, trial of the fraud upon the court issue was had May 10–13, 1982. The matter now stands submitted following the filing by counsel of supplemental proposals for findings.

The Court, deeming itself fully advised, has concluded upon the basis of background circumstances of which judicial notice is taken, uncontroverted facts recited in the pretrial order, the resolution of disputed issues and conflicts in the evidence in accordance with the following findings of fact and discussion, and the conclusions of law appearing thereafter, that the 1956 judgments in the cases above designated should be vacated and the cases processed for retrial because of fraud practiced upon the court by representatives of the United States Government.

In 1955, six actions were brought against the United States by the sheep owners pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., who alleged that atmospheric testing of nuclear devices in Nevada during the spring of 1953 had damaged their herds. The first of these actions (the Bulloch case) was processed and tried as representative of the others and in the hope that its final resolution might be dispositive of all. The Court denied the Government's motion to dismiss the complaint on the Government's contention that the testing was in the exercise of a discre-

---

1. *(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.* On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. . . . This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding . . . or to set aside a judgment for fraud upon the court. . . .

tionary function for which there could be no liability by reason of an exception set out in section 2680(a) of the Act. The Court held that in the context of the sheep owners' claims apart from the decision to carry out the tests there could be liability depending upon the circumstances proved at trial. *Bulloch v. United States*, 133 F.Supp. 885 (D.Utah 1955).

At the trial of the Bulloch case, the Court ruled in effect that the Government was negligent in monitoring the tests in view of the presence of sheep herds in areas likely to be affected. It observed that "[t]here were no advance warnings given or other precautions taken to safeguard the herders or their sheep," that there was no suggestion in the evidence of any unexpected development, "and that the Atomic Energy Commission did not attempt to ascertain the location of the sheep with or without reference to any prospective pattern of fallout dependent upon winds." It accordingly concluded that the case turned upon "whether damage did in fact occur to the Bulloch sheep as a result of atomic testing." *Bulloch v. United States*, 145 F.Supp. 824 (D.Utah 1956).

On the latter crucial issue the case failed essentially because of the overwhelming weight of the expert testimony marshaled by the Government to demonstrate that there was no possibility of radiation damage to the sheep, the renunciation of contrary views by two out of the three experts originally entertaining the opinions that radiation damage occurred,[2] the fact that laboratory experiments had failed to support the theory of any such damage,[3] and the Government's explanation that a combination of drought, malnutrition and disease was the most likely cause. Notwithstanding the compelling nature of the scientific opinion, the Court was troubled by some circumstantial evidence suggesting a contrary conclusion and particularly unsatisfactory proof of any reasonable alternative to radiation damage.[4]

But believing the apparently unquestionable scientific evidence to be controlling, the Court entered judgment in favor of the Government and against the sheep owners. Notwithstanding the offer of plaintiffs' counsel to waive formal findings of fact, the Court incorporated written findings in its published memorandum decision and entered judgment on the basis of them. The plaintiffs in the six similar lawsuits accepted the decision in the Bulloch case as dispositive of their claims and consented to their dismissal. The judgments of dismissal were never appealed.

So far as the Court was aware, no question concerning these judgments was raised

---

2. Of the three professional men who originally suggested radiation damage, two upon further consideration questioned their original diagnosis. None of them claimed to be particularly qualified in the field of radiation. On the other hand, some of the best informed experts in the country expressed considered and convincing judgment that radiation damage could not possibly have been a cause. *Bulloch II*, 145 F.Supp. at 827.

3. Because of the concealment of significant laboratory testing by Dr. Bustad which was highly relevant as hereafter found, plaintiffs had to contend at the trial that the reported controlled experiments were largely irrelevant. Thus the Court observed in its decision at p. 827 that "plaintiffs argue that there were differences in the sheep involved in controlled experiments and the Bulloch sheep and that by reason of these differences a finding that radioactivity was not the cause of plaintiffs' damage would be possible."

4. In its oral decision, the Court referred to the attempts of plaintiffs' counsel to question the applicability of the controlled experiments relied upon by the Government, and indicated the problem of setting up its own ideas of the inapplicability of the tests as against the expert opinion, and added:

> But if I should do that I would be confronted by the positive testimony that the largest amount of fallout in the area in which the sheep could have been was well within the limits which could be tolerated . . . by sheep without any harmful effect or observable effect whatsoever.

Tr. of Oral Dec. at 11.

Later in the oral decision (p. 14) it was stated:

> I am not satisfied on the exact cause of these excessive losses. That part has bothered me a good deal. That there should be a combination of all diseases and not readily observation during the preliminary investigations and subject to diagnosis, is one of the difficult problems in this case.

until hearings of committees of the Congress in 1979 developed, tangentially to their primary inquiry concerning the effects of radiation upon humans and without questioning the propriety of the Court's 1956 judgments on the evidence before it, indications that there had been a "cover-up" by the Government at the trial of significant information concerning the effect of radiation upon animals in the "sheep cases." These hearings led to the filings by plaintiffs of the present proceedings to set aside the prior judgments for alleged fraud upon the court.

Before considering in detail the positions of the parties in these proceedings and making findings of fact and conclusions of law on the disputed issues now presented, additional background circumstances may be useful.

While not developed in the record, the Court has accepted the suggestion of the Government that it should take judicial notice of various historical facts.

The Nevada Test Site was established on December 18, 1950, by Order of President Truman. The establishment of a continental test site for nuclear weapons occurred amid much public debate and at a time of international crises which was widely perceived as a threat to peace and to the security of the nations of the free world.

In 1947 the Soviet Union was positioning itself to fill the economic and political vacuum in war ravaged Europe. In 1948 a communist coup overthrew the government of Czechoslovakia, and the Soviet Union began to threaten surface transportation between Berlin and West Germany. In 1949 communist forces were victorious in overrunning China. Also in 1949 the Soviet Union succeeded in detonating an atomic device, thus breaking the United States' nuclear monopoly. In 1950 hostilities broke out in Korea and American military forces were assigned to that conflict. Accordingly, the President committed the resources of the Atomic Energy Commission (AEC) to the rapid development of thermonuclear weapons.

The necessity for a continental test site was premised on the need to evaluate certain nuclear devices quickly and in close proximity to the AEC laboratories without the costs and consumption of traveling time required by use of the Pacific test range. Moreover, the conflict in Korea threatened the security of the Pacific test range, whereas the security of a continental site was insured.

The following additional background facts are established by admissions in the pleadings or by stipulation:

1. The "Upshot-Knothole" test series of eleven atmospheric nuclear tests was conducted between March 17 and June 4, 1953, at the Nevada Test Site. Two tests which contributed fallout to areas where plaintiffs' sheep were located were the 24.4-kiloton "Nancy" shot fired on a 300-foot tower on March 24, 1953, and the 32.4-kiloton "Harry" shot fired on a 300-foot water tower on May 19, 1953. At the time of these two test shots, plaintiffs' sheep were located at various sites at various times within an area from 40 miles north to 160 miles east of the test site. Of these sheep an unusually high number of ewes and lambs died during the spring of 1953.

2. Radioactive fallout from shot "Nancy" traveled in a northerly direction from the Nevada Test Site, and fallout from shot "Harry" traveled in an easterly direction from the test site.

3. Plaintiffs sued defendant on February 17, 1955, alleging that plaintiffs' sheep died as a result of exposure to radioactive fallout from atmospheric tests at the Nevada Test Site.

4. The genesis of the action was an unusually high number of deaths of sheep which had been grazing on winter pasture in an area adjacent to the Nevada Test Site during a series of atomic tests in 1953.

5. The possibility that radioactive fallout from the tests might be a cause of the sheep deaths was raised in late spring and early summer of 1953.

6. An investigation of the sheep losses was commenced on June 5, 1953, by the U.S. Public Health Service and the AEC.

7. Based on an initial investigation, it was determined that the fallout might have been a contributing factor in the deaths. In order to arrive at more conclusive findings, however, additional scientific investigation was recommended.

8. Such investigation was conducted during most of the remainder of 1953 at primarily three locations: the Hanford Works in Richland, Washington; Los Alamos Scientific Laboratory in Los Alamos, New Mexico; and Oak Ridge National Laboratory, Oak Ridge, Tennessee.

9. A Final Report of the investigation was published by the AEC on January 6, 1954. The report was concurred in by the U.S. Public Health Service, and the U.S. Bureau of Animal Industry, and reviewed without concurrence by the Department of Health of the State of Utah. Attached to the Final Report were two related reports: A Comparative Study of Hanford and Utah Range Sheep prepared by Dr. Bustad and others for the AEC and to be distinguished from his "fetal lambs" report hereinafter referred and Comparative Study of Experimentally Produced Beta Lesions and Skin Lesions in Utah Range Sheep (prepared by Lushbaugh and others).

10. The investigation by the AEC concluded that radiation was neither the cause nor a contributing factor to the sheep losses.

11. The report was presented by various of the scientific investigators to the press, the sheep men, and to other members of the public in an open meeting at Cedar City, Utah, on January 13, 1954.

12. From 1950 to 1954 the Hanford Laboratory conducted experiments utilizing sheep to determine the effects of concentrations of I–131. Both Dr. Pearson and Dr. Trum were aware of the Hanford experiments and the published reports thereof.

13. Dr. Monroe A. Holmes, a U.S. Public Health Service Veterinarian assigned to the Utah State Department of Health, participated in initial and subsequent field investigations of the sheep deaths in early June 1953. (He is now deceased.)

14. Dr. Robert Veenstra was a United States Army Veterinarian assigned to the U.S. Naval Radiological Defense Laboratory in San Francisco, California. He participated in initial and subsequent investigations of the deaths of plaintiffs' sheep, and concluded that radiation was a contributory cause of the deaths.

15. Dr. Robert Thompsett, a small animal veterinarian in private practice at Los Alamos, New Mexico, participated in the investigation of the deaths of plaintiffs' sheep at the request of the AEC and his initial view was that radiation contributed to those deaths. (Dr. Thompsett is now deceased.)

16. During the discovery stages of the original case, plaintiffs submitted interrogatories to the United States regarding the AEC investigation into the sheep losses. The interrogatories and defendant's answers were as follows:

INTERROGATORY NO. 28: Did anyone involved in the investigation disagree with the reports?

ANSWER: We are not aware of anyone who is involved in the Commission's investigation of the alleged sheep losses who now disagrees with the report issued by the AEC.

INTERROGATORY NO. 29: Did anyone conclude that radioactive fallout was a possible cause of the injury to the sheep?

ANSWER: We do not know of anyone connected with the AEC's investigation of the alleged sheep losses who has now concluded that radioactive fallout was a possible or probable cause of the injury.

17. At the trial, the contention was made by counsel for the plaintiffs that there had been a cover-up by the Atomic Energy Commission and that witnesses had been coerced into changing their conclusions. In response to these contentions, the Court made the following comment:

THE COURT: That's the thing that bothers me. Now, Mr. Bushnell, if that were so, considering that also in the fallout area, without, let us say, great circumspection, anyway, advising the hu-

man beings in that area about the danger, there was fallout sufficient to cause the death of animals, and these gentlemen investigating it, in order to coverup for the government, either knew or suspected the possibility of that extent of fallout, and those consequences to animals, involving the death of large numbers, and realizing also that not only the welfare of the people in that area but the welfare of future generations and other bodies of people in connection with other tests would be jeopardized by a false apprisal of the situation in that respect, do you want me to believe that they aren't giving their best consideration objective opinion with reference to the effects, if any, of radiation?

MR. BUSHNELL: I do.

18. In 1979 Congress and the Department of Health, Education and Welfare conducted investigations of the health effects of low level radiation. Congressional hearings were held by Congress at Salt Lake City on April 19, 1979, in Las Vegas on April 23, 1979, and Washington, D.C., on August 1, 1979.

The plaintiffs contended and sought to prove in the present proceedings as the basis of its claim of defendant's alleged fraud upon the court that:

1. The AEC prior to 1956 had experimental evidence of the effects of radiation on fetal lambs which it concealed from the Court and from plaintiffs which showed results surprisingly similar to those suffered by the lambs of the plaintiffs.

2. The AEC acting through its representatives wrongfully pressured its own investigators and potential witnesses in the trial to change their testimony or not to testify at all.

3. The Government attorneys involved in the preparation and trial of the case either participated in or had knowledge of the intimidation of expert witnesses or the efforts made to cause said witnesses to alter their testimony.

4. The Government attorneys participated in concealing documents and data by submitting evasive, misleading and untrue answers to interrogatories.

5. The AEC falsified documents.

6. The AEC deliberately covered up and concealed the truth concerning the extent and effects of radiation upon the Cedar City sheep.

Defendant denied the plaintiffs' claims, asserted that some of them were not properly before the Court on the issue of fraud, and contended in any event that plaintiffs' claims were barred by laches and limitations. All of these contentions were explored in the present proceedings.

The plaintiffs have charged from time to time that defendant since the filing of this case has improperly secreted or withheld relevant records from them as a continuation of the alleged prior "cover-up." The defendant has asserted privilege or confidentiality with respect to some relevant documents, has delayed production of some and commingled others with a larger number of less relevant papers without the segregation plaintiffs have demanded and has failed to timely disclose its possession of a box of exhibits which were proposed or received in the original litigation. With respect to the latter subject, the sinister implications suggested by plaintiffs and initially entertained by the Court have been dispelled by reasonable explanations made by present counsel for defendant, based upon the stipulated order made by the Court in 1956 which permitted each party to withdraw its exhibits in view of the lack of any intention to appeal, and the commingling of these records with other files or boxes in the Department of Justice thus delaying their identification. With respect to discovery generally, both sides in the present litigation have been contentious but have proceeded in good faith and generally with propriety. Any failures and shortcomings have involved no more than thoughtlessness and have not substantially impeded the fair exploration and development of the evidence on the basic issue of fraud upon the court, which turns essentially on the conduct of the original Bulloch trial and its antecedents and not upon any question of

discovery incident to the present action to set aside the prior judgments. The diligence, good faith, circumspection and propriety of present counsel for the parties during the present proceedings are not subject to reasonable question in the opinion of the Court.

The stenographic notes of the official court reporter at the original trial were destroyed by the Clerk of Court or with his authorization in harmony with law and the practice of the court, likely during or about the year 1979, but in any event long after the 10-year period during which such records were customarily retained. Up to that time no one had suggested that the records of the Clerk's Office pertaining to this original case were of continued importance. The first formal request by the plaintiffs to the Clerk's Office for the court's records was on May 20, 1981, but the evidence suggests that during the period of no more than a year prior to that time plaintiffs' counsel and perhaps others had informally attempted to locate the stenographic notes by inquiring of the Clerk's Office and the court reporter. No transcripts of those notes had been made except for partial evidential transcripts, transcripts of arguments, and pretrial proceedings, pretrial depositions and the oral decision of the Court, all of which have been made available for the purposes of the present proceeding and which have proved useful, but not wholly satisfactory, in reconstructing significant elements of the trial. The court's regular files of these actions were maintained and have been recovered from the archives for the purposes of these proceedings.

The discussions and evidence at the trial and during the present proceedings generally referred to the subject matter of the damages and deaths in question as "sheep" but it was and is generally understood that such references were intended to cover "lambs" whether "fetal" or otherwise unless expressly ruled out. At the original trial and during the preceding investigations it was both germane to inquiries concerning "sheep" and fairly called for in responses thereto, to describe the situations of both lambs and sheep.

## II FINDINGS OF FACT

1. The "Upshot-Knothole" multi-shot experiment of eleven atmospheric nuclear tests was conducted between March 17 and June 4, 1953, at the Nevada Test Site. The cumulative yield (energy release) of the explosions was 252 kilotons. The two tests which contributed the greatest amounts of fallout to areas where plaintiffs' sheep were known to be grazing were the 24.4-kiloton "Nancy" shot fired on a 300-foot tower on March 24, 1953, and the 32.4-kiloton "Harry" shot fired on a 300-foot tower on May 19, 1953. At the time of these two test shots, 11,710 sheep were grazing in an area from 40 miles north to 160 miles east of the test site. Of these sheep, 1,420 lambing ewes (12.1%) and 2,970 new lambs (25.4%) died during the spring and summer of 1953.

2. After studying the conditions surrounding these deaths the AEC reported as before noted that there had been no causal connection between the sheep's exposure to radioactive fallout emitted during the "Upshot-Knothole" test series and their deaths. The Commission's formal conclusions, released on January 6, 1954, were introduced by the following press statement:

On the basis of information now available, it is evident that radioactivity from atomic tests was not responsible for deaths and illness among sheep in areas adjacent to the Nevada Proving Grounds last Spring, the U.S. Atomic Energy Commission reported today.

The AEC findings, reached as the result of extensive research studies, was concurred in by the U.S. Public Health Service and the Bureau of Animal Industry, U.S. Department of Agriculture. Prior to issuance by the AEC, the report was reviewed by the Department of Health, State of Utah. Special studies were conducted by veterinary and medical research scientists at Los Alamos Scientific Laboratory and Hanford Works and the University of Tennessee to determine whether radioactivity contributed to the deaths.

3. The final report was concurred in by the U.S. Public Health Service, and the U.S. Bureau of Animal Industry, and reviewed by the Department of Health of the State of Utah without concurrence, and there is reason to believe that certain participating representatives of the Public Health Service had serious misgivings about the conclusions of the report. The published report concluded that radiation was neither the cause of nor a contributing factor to the sheep losses. The report was presented by various scientific investigators to the press, to the sheepmen, and to other members of the public in an open meeting at Cedar City, Utah, on January 13, 1954.

4. At or within a few months after this public hearing it was apprehended by representatives of the AEC and could reasonably be foreseen by the Commission that the sheep owners suffering the excessive losses in question might bring legal action against the United States. It is reasonable to infer from the evidence, and the Court finds, that from no later than a few months after this public hearing, among the objectives of some representatives of the AEC in making further investigation and releasing further information were the dissuasion of lawsuits against the Government and, if such lawsuits were filed, to increase the likelihood of the Government's winning them in view of the perceived importance to the country of the continuation of atmospheric testing without obstruction by public opinion or judicial action.

5. The defendant's preparation of the defense of the case included visits and interviews with persons involved with the initial and ensuing investigations by the governmental and other agencies into the cause of the death of the sheep. The persons visited and interviewed included persons who felt radiation was or could be a contributing cause of the sheep deaths as well as persons who concluded that it was not.

6. Among the first investigators to arrive in the Cedar City area were four veterinarians: Dr. Arthur Wolff, U. S. Public Health Service; Dr. Monroe Holmes, U. S. Public Health Service; Dr. R. E. Thompsett, contracted by the AEC to operate a pet hospital at Los Alamos; and Dr. Robert Veenstra, U.S. Army, Veterinary Corps. Later investigations were made at the request of the AEC by Dr. Rust, Veterinary Corps, U.S. Army, Dr. Comar, Professor of Biochemistry, University of Tennessee, and Dr. Trum, U.S. Army Veterinary Corps. By the time the first investigators arrived in Cedar City, the carcasses of plaintiffs' dead sheep had been destroyed. Consequently, investigators examined a limited number of surviving sheep selected by one of the plaintiffs as showing surface symptoms similar to those which had been suffered by the dead sheep.

7. In view of the random and largely unreconstructible nature of fallout distributions and sheep grazing patterns, there was no assurance that if the dead sheep had suffered radiation injury or resulting death any particular surviving members of the same herds would exhibit radiation injury. There were "hot spots" in which radiation was many times as intense as in adjacent areas, and there is no uniform dispersal of sheep in a given herd. There is testimony tending to show that some sheep were in areas of inordinately high concentrations of fallout. The radiation doses or levels in particular areas in view of variables that have to be assumed in any dose computations render it impossible to say with any degree of certainty on the basis of objective evidence that radiation damage did not cause or contribute to the deaths of the sheep in question irrespective of circumstantial evidence to the contrary.

8. In 1979 Congress and the United States Department of Health, Education and Welfare conducted independent investigations into the health effects of the Nevada nuclear tests of the 1950's and the 1960's. In connection with public hearings several previously classified documents and reports were released. Testimony before the Committees tended to show that the sheep in question were in areas of above normal radioactive fallout with reference to the "Nancy" shot on March 24 and the "Harry"

131

shot on May 19, 1953; that the AEC did not have definite information as to the amount of actual radioactive fallout to which the sheep were exposed; that government records were changed to discount evidence of a causal relationship between radiation exposure of the sheep and their deaths; that without adequate justification the AEC disregarded or discounted clinical information supportive of a conclusion that radiation was the cause of death; that the AEC had evidence which substantiated the fact that the dead sheep had received considerably more radiation than the amounts expressed in the AEC reports; that there were differences of opinion as to whether the experimentally produced lesions were comparable to those observed on the Cedar City sheep; and that the final report of the AEC was falsely presented as representing the unanimous view of those who participated in the investigation and signed the report.

9. On the basis of the 1979 hearings the plaintiffs made further investigation leading to the commencement of the present proceedings on February 25, 1981, to vacate the 1956 judgments for fraud on the court.

*Radiation Exposure as the Cause of Sheep Injury; "Fetal Lambs"*

10. The defendant's representatives contended and testified at the original trial, and the Court accepted their position, that plaintiffs' sheep herds could not have been exposed to radiation in excess of 5r which was wholly insufficient to cause injury to plaintiffs' sheep. Neither the defendant nor its representatives had such positive knowledge. When the radiation maps were being created prior to the trial upon which the AEC was to rely the figures were ad-

justed or juggled in such a way as to throw doubt upon their accuracy.[5] In an official AEC staff report (604/3 Nov. 4, 1953), by the Director of Biology and Medicine, Dr. Paul Pearson, it was reported that the infinite gamma dosage where the sheep were located "would not exceed 5 roentgens." In that same report information was given which when placed in its true context would indicate that exposure was in the range of 30 to 100 roentgens and possibly higher. In paragraph 12 of the staff report, the statement was made that readings on the backs of sheep (surviving sheep) were "up to 2 and 4 mr per hour." The statement omitted the fact that this reading was made 26 days after exposure.

11. Commencing in 1949, and continuing to the time of the original trial, extensive experimentation had been conducted at Hanford, Washington, by General Electric Corporation, for the Atomic Energy Commission, with reference to the effects of radioactive iodine on sheep. Some of that experimentation pertaining to the effect upon fetal lambs had been completed by 1952. The results of this experimentation were known by the AEC, and more specifically to Dr. Paul Pearson and his associates in the Department of Biology and Medicine and to Col. Trum at the Atomic Experiment facilities in Oak Ridge, Tennessee. Such information was not discussed with or revealed to the plaintiffs and the court before or at the trial. To the contrary, the representation was made by Dr. Bustad, who conducted the experimentation that "the Utah sheep showed no evidence of the radiation damage observed in experimentally

5. For example, it has now been revealed that in the course of the creation of these maps the following comments were made by some of those responsible:

The 10r spot on our map should be changed to 5r to be consistent with page 504 of the report. Actually, we have readings to confirm either figure, but I, personally take the lower as being more reliable.

. . . .

Although I have but one reading taken more than two weeks after this shot to back up my contention, I feel that the area immediately adjacent to the eastern boundary of the NPG

had activity about five times that indicated. This comes from a comparison with shot 7 and also from the burns on the horses which would require more dose than indicated.

. . . .

It appears that it would be helpful if a map drawn by Commander Johnson ... could be compared with Johnson of the Los Alamos Scientific Laboratories. Since these gentlemen do not seem to agree on the fallout areas it is important that we establish which of them presents the official position the Government is to take in this regard.

treated sheep." A complete report concerning the results of this experimentation was not published by Dr. Bustad until 1957. The experimentally treated sheep had in fact developed signs and conditions almost identical in appearance to those observed in plaintiffs' sheep, particularly with reference to the new-born.

12. Dr. Monroe A. Holmes, a U.S. Public Health Service veterinarian assigned to the Utah State Department of Health, was a member of the Government team that conducted the first field investigation of the sheep deaths in early June 1953. He gave the following description of the affected sheep as it pertained to the condition and symptoms of the new-born lambs:

Majority of the lambs were born dead in a stunted condition. Ewes died either during lambing or within a few days after. Stunted lambs were considered to be full-term, completely and well-formed—no disfigurements nor monstrosities, but were of approximately one-half normal birth size. These were not aborted lambs, being delivered after full gestation period. Lambs that lived would survive up to 5 or 6 days. They were weak in appearance and action, and, upon lying down, would have difficulty in getting up or standing. A few tried to nurse, but were unable to do so because the ewe apparently had little or no milk. Attempts were made to hand-feed some of these lambs, but, due to the great number involved, it became an impossible task and deaths occurred too quickly to ascertain whether or not hand-feeding was feasible. (T4–3.)

13. In the undisclosed 1952 report of Dr. Bustad as to the effects of radioactive iodine on pregnant ewes and new-born lambs, the following information was given:

At birth, only one of six lambs born to the ewes fed 135 uc/day was able to stand and nurse unassisted. The others were weak, showed a stupid and lethargic attitude with drooping ears and a depressed head. Two of the lambs died before they were two days old and a third one was sacrificed since it was too weak to stand.

The six remaining ewes in the group previously fed 240 uc/day for 450 days (April 1950 to July 1951) gave birth to nine lambs. Four of these lambs were stillborn. The remaining five were normal in appearance but were smaller, showing a mean birth weight of 2 kg compared with an average of over 4 kg in other groups. Since the dams of these lambs produced insufficient milk to sustain their offspring only two animals were retained beyond one month. These two animals, maintained on a supplement of evaporated milk, developed normally. (T4–19, T22–14, 16.)

14. The similarities between the effects of radiation on Bustad's laboratory lambs and the symptoms Holmes noted in the Utah lambs are impressive as the following summary demonstrates:

| Bustad's Hanford Observations | Holmes' 1953 Observations |
| --- | --- |
| 1. Of nine lambs born to ewes fed 240 uc/day for 450 days, "four were stillborn." | "[The] majority of lambs were born dead in a stunted condition." |
| 2. "The remaining five were normal in appearance but were smaller, showing a mean birth weight of 2 kg compared with average of over 4 kg in other groups." | "Stunted lambs were considered to be full-term completely and well-formed . . . but were of approximately one-half normal birth size." |
| 3. "At birth, only one of six lambs born was able to stand and nurse unassisted." | "A few tried to nurse, but were unable to do so because of weakness." |
| 4. "The dams of these lambs produced insufficient milk to maintain their offspring." | "The ewe[s] apparently had little or no milk." |
| 5. "The others were weak, showed a stupid and lethargic attitude with drooping ears and a depressed head." | "They were weak in appearance and action." |
| 6. "A third one was sacrificed because it was too weak to stand." | "Upon lying down, [they] would have difficulty in getting up or standing." |

15. Bustad's experiments further demonstrated that conditions resembling those observed in plaintiffs' fetal lambs were found whether exposure to radioactive iodine occurred during the entire gestation pe-

riod, the last half of gestation, the last trimester of pregnancy, or for only two months while the fetus was in utero; also that such symptoms were observed as to all the fetal lambs of ewes fed 1800, 240 or 135 microcuries of iodine per day. Bustad further observed that "concentrations of I–131 in the fetal thyroid may be two to three times that of the dams in advanced pregnancy."

16. No one now denies that the foregoing evidence was important for investigation by plaintiffs and consideration by the Court in connection with other evidence concerning the causal connection between radiation and sheep injury. Dr. Bustad himself so concedes but attempts to explain its omission from discussion in the reports made available to the plaintiffs and the Court on the grounds that his reports were made merely for the information of the AEC which already had his fetal lamb report, and that the latter was cited in footnotes in the reports released to the sheepmen and to the public. The Court finds these explanations insufficient. The AEC and its representatives preparing for the defense of the original actions had all reports and knew the significance of Dr. Bustad's fetal lamb report. Whether Dr. Bustad intentionally buried it in footnote references in his released reports as a ploy is beside the point. It was buried, and those managing the Government's investigation without commenting on the suppressed report submitted others to a different effect with their final report, and in connection therewith reiterated the statement that Bustad included in his addendum report that "the Utah sheep showed no evidence of radiation damages observed in experimentally treated sheep."

17. Dr. Bustad further attempted to defend the absence of discussion of the fetal lamb report in the released material on the ground that he was assigned by the AEC to address only the issue of radiation effects on "premature lambing." Such an explanation raises even more far-reaching questions. A summary of losses to plaintiffs' sheep showed only about 20 premature lambs and in excess of 2300 lambs dying after a normal gestation period. Premature lambing was not the real problem. Any direction of Dr. Bustad's efforts exclusively to that comparatively trivial aspect of the lamb problem could suggest an even more devious and sophisticated plan of concealment.

18. Defendant seeks to discredit the weight of the fetal lamb report on the claim that plaintiffs have made an erroneous comparison between the plaintiffs' sheep and the sheep involved in the controlled experiments without taking into account quantity variations of radioactive iodine to which the respective ewes were subjected. The validity of such a contention is far from clear on the present record and some of Dr. Bustad's own figures render it questionable. But the Court need not—indeed should not—at this stage and on the basis of only a partial record determine the weight of the concealed evidence in connection with all of the other evidence on the merits. Suffice it to find, as I do, that the evidence wrongfully withheld at the trial, including the fetal lamb report, was of substantial significance and weight in favor of plaintiffs' claims for damages and was essential to a fair and proper consideration of the merits of those claims by the Court. Government counsel's contention now that "the similarity between the Hanford experimental lambs and the plaintiffs' sheep is purely coincidental" must be rejected on the present record. That point in fairness and in the interest of justice on the present showing must be reserved for retrial on the merits when the fact finder in view of other evidence heretofore concealed can reweigh the earlier claim of "mere coincidence," *i.e.*, that the unprecedented injuries and deaths suffered by plaintiffs' sheep during the period and in the vicinity of atomic bomb testing in Nevada was a "mere coincidence" ascribable only to malnutrition, drought and disease operating independently of radiation.

19. Nor can the Court accept Dr. Trum's explanation that the missing report would have confused the Court, or suggestions that experts may have had the right to

relegate the Court in some respects to "objective" evidence personally observed by himself and his associates as distinguished from circumstantial evidence.[6]

*Witness Pressure*

20. Dr. Robert Veenstra was used by the Atomic Energy Commission to observe and investigate the effects of radiation on animals at other atomic test sites. He was on the first field investigation team assigned by the Commission to examine the alleged losses to the Cedar City sheep. He submitted the following conclusion in June 1953:

> In view of hyperplasia, presence of detectable gamma radiation in the bone marrow, skin lesions, possibility of toxins due to the lesions and the presence of pregnancy in many ewes it is my opinion that radiation was at least a contributing factor to the loss of these animals.

21. Evidence unrevealed at the time of the original trial shows that on October 19, 1953, Dr. Pearson wrote to Dr. Veenstra in an attempt to change his opinion by citing some recent AEC calculations of thyroid dosages. Pearson urged Veenstra to review the data and then report back "as to whether or not in view of these data you [still] feel that radiation was a contributing factor. . . ." On December 23, 1953, Dr. Veenstra mailed his response to Pearson in which he stated:

> The impression seems to exist that I based my opinion regarding the Utah and Nevada livestock problem entirely on the findings of I–131 in the thyroids. This is not the case.
>
> As you know, we found radiation present in the kidney, spleen, rib and liver as well as in the thyroid. We also know the animals were in poor physical condition

and that many were pregnant. In addition, the presence of lesions and their type and location on the animals must not be overlooked.

> It was this combination of circumstances that caused me to form the opinion that I did.

22. Dr. Bernard Trum acted as liaison for the defendant and its attorneys in preparing to defend against plaintiffs' claims. Recently revealed evidence discloses that Dr. Trum wrote to Dr. Veenstra in March 1955:

> The scoop is that the ranchers are about to start suing the government for those 1953 losses. If they do there isn't any way we can keep from getting involved. In the last report I had a chance to see that you rendered, I got the distinct feeling that you felt that there was a chance that radiation could have caused the death of some of the sheep at least. In the interim substantial work has been done which may have caused you to change you're [sic] mind.

Dr. Trum then furnished data on claimed radiation dosage and concluded:

> Because you didn't have this information available when you were asked to make your statement I've been wondering if you might not have changed your mind about these things. If you haven't changed your mind I'd like to know what you are basing your opinion on for I shouldn't like to go into this thing divided within our own Corps if we can avoid it. Hope to hear from you soon.

Before Dr. Veenstra could submit a written reply to Dr. Trum, the latter paid a personal visit to Veenstra in San Francisco. Over the course of three hours, Trum and Veenstra exchanged views and Trum later recorded Veenstra's reaction:

> Dr. Trum further explained that he, Dr. Rust and Dr. Comar were directing the investigation and that they acted only to obtain results indicated by "objective" criteria: "You see, in the first place, everything we were trying to keep in mind was objective. We did not see lambs. We heard no indication that there was pregestational radiation."

6. Concerning the desirability of the Court's having had the benefit of the fetal lamb report he testified among other things:

> Dr. Trum: Your Honor, I think it would have been very confusing.
> Q: (the Court): You think it would have confused the court to have that similarity pointed out?
> A: It would have confused everybody, because they were not related.

April 2, 1955—San Francisco, California Visited Lt. Col. Robert J. Veenstra, Bio & Med Sciences, Code 3–921A, USDL, San Francisco 24, California (4/1/55). At our request he invited Dr. Charles Sondhaus of that laboratory to meet with us. It was their opinion that several factors had not been satisfactorily explained in the investigation of sheep deaths following the Spring Series 1953 tests at the Nevada Test Site.

It was their opinion that the independent studies of Lushbaugh at Los Alamos and of Kornberg and Bustad at Hanford were not conclusive inasmuch as they dealt with only isolated actions of a beta emitter on the skin and a dose or doses of iodine-131. The accumulated effects of the total fission product spectrum was not adequately considered. In addition, it was felt, particularly by Sondhaus, that the AEC had placed too much stress on the document by Dunning (Compilations of Radiation Dose to thyroid, etc.) estimating dose received.

**7.** The "unpublished letter" by Veenstra was a strong refutation of the position of the AEC. The letter is as follows:

(This letter was not sent—has not been published and is confidential to the Department)

7 Apr 1955
3–921A
RJV:jh

Lt. Colonel Bernard F. Trum, CC.
UT–AEC, Box 142
Oak Ridge, Tennessee
Dear Colonel Trum:

In reference to your letter of 25 March we are submitting a file for your information. We feel that our position has not been materially changed: basically we are still of the opinion that radiation could have contributed to the deaths of the animals. Although it is of course difficult to decide what degree of damage would have followed from a given exposure of this type, we are aware of the additional studies that have been carried out and we are convinced of their validity, but not completely of their relevance.

The following points merit considerations:

a. The Hanford studies have indeed shown that very high doses are required to produce thyroid disfunction that will lead to mortality in sheep. However, we feel that in Nevada sheep, thyroid damage was certainly not the most important radiation induced injury. At the time of the injury iodine 131 constitute only 0.1 per cent of the total fis-

23. A few days after this visit (April 7, 1955), in a letter addressed to Trum, Veenstra again defended his position:

We feel that our position has not been materially changed; basically we are still of the opinion that radiation could have contributed to the deaths of the animals.

He then reviewed his reservations concerning government experiments: The Hanford tests "were on healthy sheep" while the Nevada sheep were in poor condition; the Los Alamos study dealt only with "irrelevant" external burns that he never claimed were a cause of death, only an indication of exposure; and "thyroid doses could have reached a level several times that originally calculated." At the top of this letter is the statement: "This letter was not sent—has not been published and is confidential to the department." The letter, dated April 7, 1955, was hand delivered to John J. Finn, U.S. Trial attorney, when he personally met with Veenstra in San Francisco.[7] Veenstra

sion product activity ingested (see Hunter, Ballou), and other elements are retained to a degree sufficient to be of importance here.

b. The Hanford experiments were on healthy sheep subject to no other deleterious influences. With the Nevada sheep there was not only further internal radiation but the animals were also observed to be in poor condition and suffering from malnutrition, "disease," exposure and whatever other hardships existed with range animals.

c. In reference to the Los Alamos study on Beta skin lesions, we feel that whether or not the Nevada sheep were externally burned is largely irrelevant to the question of mortality. The presence of beta burns on the Nevada sheep were considered by us to be significant only as an additional indication of exposure and not as a potential cause of death.

d. In regard to the blood cell level report both RBC and WBC were low (see enclosure). This might indicate radiation exposure but certainly is not specifically diagnostic.

e. We agree with you that the external gamma dose is negligible and does not enter into the question.

f. One cannot safely conclude that the doses to the thyroid were as low as the original estimates indicated. According to our calculations, the thyroid doses could have reached a level several times that originally calculated. (Sondhaus calculations) Also, though the activity found in the thyroid

testified at the original trial that in his judgment there was a causal connection between radiation and injury to the sheep. It seems likely, however, that the Trum pressure chilled the maintenance of his opinion and that the Government's answers to interrogatories and other circumstances hereinafter mentioned diverted plaintiffs' counsel from a searching exploration of his views for fear of having the ground cut from under his case by complete neutralization of the initial reports favorable to plaintiffs' claims.

On the same day the unpublished letter was written and despite Veenstra's statement that he would like to see the experiments referred to by Trum before taking an official position, Veenstra wrote a handwritten letter abdicating his long-time and forcefully defended position that radiation was a contributing cause. The Court finds in such strange and tortuous behavior together with surrounding circumstances recounted hereafter further indication of unacceptable pressure placed by the Government upon witnesses adverse to its position, deceitful conduct beyond acceptable discussions among scientific colleagues preparing

to reflect their own views in court, and an undermining of the processes of the court as an institution. While Veenstra did appear at the trial and expressed his continued opinion that radiation was or may have been a contributing cause of the damage to the sheep, his testimony was not impressive and discounted his status as an expert according to the Court's present recollection. Unfortunately a transcript or notes of that testimony are not now available for reasons mentioned earlier.

24. Dr. Trum wrote to Llewellyn Thomas, Assistant United States Attorney who was working on the defense of the case, on May 12, 1955, that Veenstra and Thompsett "will definitely state that they do not have evidence that radiation injury was either the cause or contributed to the death of the sheep" and that they would disqualify themselves. Whether Dr. Veenstra in effect did so in his testimony cannot now be determined with certainty.

25. Thompsett was also one of the members of the first investigating team and he too concluded that radiation was a contributing cause of the death of the sheep. Prior

serves as an index of total radiation exposure, the thyroid dose is but one of several possible types of internal radiation which will occur when ingestion of mixed fission products has taken place. The most important of these appears to be the dose to the bone marrow from long lived isotopes with slow biological turnover. This effect has generally been considered to be chronic in character, but it appears possible that "short term" effects may also occur if concentrations are sufficiently high and the emitters are of moderately long half-life.

In particular Sr 89, Ba140, Ia140, and other elements may have been deposited in the bones in significant amounts, contributing to the total radiation effects. Unfortunately very few samples of either bone or tissue were ever either radiochemically analyzed or examined pathologically to check this.

In reference to this point the analysis of bone samples reported in the AEC report (6 Jan 1954) stated that practically all of the beta activity in the bones was due to Sr90 –Y90. We feel Sr90 to be relatively unimportant at this time; its presence should imply 100 fold greater concentration of Sr89, for instance, to say nothing of other fission products necessarily present in the animal on the basis of the Hunter, Ballou and Hamilton data.

Based on the very limited data available to us at the time the above calculations were made we feel that the question of radiation injury was still an open one. However, on 1 April 1955 Lieutenant Colonel B. Trum and Major C. Kuhn during their visit to the laboratory informed us of the existence of a large experimental program done by them at the Oak Ridge Laboratories. We were at no time informed of the existence of such an experimental program prior to the above discussion with Lieutenant Colonel Trum. They conclude from their histopathological and radiochemical studies that the internal radiation hazard could not possibly have contributed to the mortality in the Nevada sheep. Since their conclusions are supposedly based on large numbers of actual samples collected in the field we must conclude that their evaluation of the situation is a more realistic one than ours, which is based on only a very few samples and theoretical calculations.

If we are called upon to make an official statement we feel that it would be necessary for us to see the data of the Oak Ridge group, and to dismiss [sic discuss] the actual experimental situation and technics [sic] involved.

Sincerely yours,
R. J. Veenstra
Lt. Colonel, V.C.

to the trial pressure was brought upon him by Dr. Trum to recant his original conclusions. Attached to a letter dated May 9, 1955, Dr. Trum sent to Thompsett a proposed "model" letter in which Trum set forth the form in which he thought Thompsett should change his original conclusions. The transmittal letter stated in part:

Dear Bob [Thompsett]:

Enclosed find model letter and documents. . . .

The letter is addressed to Woodruff . . . . Send one to Pearson too if you want to because he's interested. If the letter is not exactly to your liking or not your style, you make the changes as you see fit. (App. 16, T16–1.)

The model letter, which Thompsett later signed with minor changes included the following statements:

. . . I did make a personal report to Mr. R. E. Cole of the AEC, Albuquerque, New Mexico. I believe I informed Dr. Pearson and perhaps your office of this report. The report pointed out that, due to the presence of radioactivity in the affected Utah sheep, the history of fallout in the locale, the lesions on the face which resembled beta-burns and the epizoological aspects of the syndrome and deaths which could not be explained by veterinarians experienced in sheep practice, I was of the opinion that radiation caused the deaths of sheep or at least contributed to them and due to the presence of affected horses and cattle too, the situation appeared to me to be very serious.

Subsequently I've re-evaluated my position as more information became available.

. . . .

I believe it is reasonable to assume sheep could tolerate with impunity the maximum radiation dose possible under the range condition in 1953.

In conclusion, let me say my opinion, as of now, is in agreement with the statement of AEC and US DPH released at Salt Lake City, January 12, 1954.

26. The contents of the model letter was in marked contrast to another undated letter in which Dr. Thompsett had expressed opposite views.

27. The undated letter written by Thompsett in part stated:

. . . However, lesions were taken from several sheep and also from the dorsal surfaces of the horses owned by the Stewart family. Examination of these lesions leaves little doubt in the mind of the undersigned as to their origin. The typical keratic appearance was the same as in the "Trinity" lesion of Cattle injured at Trinity and a former Las Vegas accident. Discoloration of the hair in the lesions from the horses was typical of the "Trinity" lesion. However, the lesions that were taken only showed a four percent (4%) of grey hair. Possibly this may increase or decrease in time.

. . . .

Again with the sheep losses I am of the opinion that the Atomic Energy Commission has contributed to great losses. I would again like to state that my report is only a matter of individual opinion. First, there is no doubt as to the origin of the lesions on the sheep. The lesions are absolutely typical of the Trinity lesion both microscopically and in the laboratory. The reasons for death in the sheep are multiple. The ovine as a species is not a hardy animal. The long trip from the Nevada grazing area to the headquarters in Utah added to their debility. Pregnancy in any animal is an added burden and the greatest percentage of these animals were young ewes. Couple these factors to a heavy strain at shearing time I am of the opinion that the lesions from radioactive burns caused pseudo-autotoxemia.

A thorough study of sheep diseases as well as a survey of endemic diseases at this time makes the syndrome of our sheep sickness aim toward a diagnosis of radio-activity damage. It is very interesting to note that one sheep owner had moved his animals from the Nevada Test area in February, (prior to the test), and he evidenced none of his animals with similar symptoms. My theory as to the

type and locality of the lesions found in the sheep is based on the eating habits of sheep. I believe that the sheep came in contact with radioactive dust from the plants in this area. The face, mouth nose and ears of the sheep have the least wool covering thus the intensive of damage to these areas. The heavy lipid covering on the sheep's body would have a tendency to "hold" particles of radioactive dust to these parts.

As to the number of animals or the amount of indemnity these sheep owners should be credited for their losses, a more detailed study must be made. I am however positive that the "Wintering" area of all animals should be a greater distance from the test fall-out area.

R. E. Thompsett DVM

Project Veterinarian.

28. Dr. Trum had the notion that the "objective" evidence he had assembled based largely upon scientific examinations and appraisals of the tissues from surviving sheep should be controlling on the issue of causation at the trial and that to have injected into the trial contrary or circumstantial evidence was to be avoided to the extent reasonably possible.[8] I find his efforts to that end were unjustified, improper and incompatible with the judicial process, and yet to have been to a substantial degree effective in withholding from the Court or weakening evidence which the Court should have been permitted to consider on its own merits in connection with other evidence in the case.

*Answers to Interrogatories*

29. During the discovery stages of the case, plaintiffs submitted interrogatories to the United States regarding the AEC investigation. Defendant's answers to them were initially drafted by Don Fowler, Charles Eason, or Mr. King, attorneys for the AEC, reviewed by all of those together with Mr. Finn, Dr. Pearson, Dr. Graves, likely by Dr. Trum and Mr. Thomas, Assistant United States Attorney, and filed by the latter with the Court. Among the interrogatories and answers were these:

Interrogatory # 28: Did anyone involved in the investigation disagree with the report? [AEC report denying causal connection between radiation on sheep injury.]

Answer: We are not aware of anyone who is involved in the Commission's investigation of the alleged sheep losses who now disagrees with the report issued by the AEC.

Interrogatory # 29: Did anyone conclude that radioactive fallout was a possible cause of the injury to the sheep?

Answer: We do not know of anyone connected with the AEC's investigation of the alleged sheep losses who has now

8. Q. (By the Court): You've told us that you didn't give a damn about what Thompsett thought, and you've told us that he wasn't—almost—that he was entitled to have anyone pay attention to him, and now you say you were hoping that he would disqualify himself.

The first point is: Is that so? Were you hoping ... that he would disqualify himself? And the second point: If you were hoping, why were you hoping that? ...

A. Now, I was really hoping that we would have little trouble having to prove every point of the errors that we knew was wrong, and that if in certain areas, for example both Thompsett and Veenstra were right about the cattle and the horses, we would not have to go into that. But now when it came to the sheep, if we had to go into every one of them, then we would have to go and argue all the facts—that we had been putting before—all out again. And there's certain of those things—for example, neither were qualified to look at a slide and tell what the expert testimony was there to do.

Q. So it's simply to save trouble at trial to have you go into these things?

A. Not only save the trouble, your Honor, but to save those little things that come into making professional people look kind of bad, you know.

Q. You were hoping to save Thompsett from embarrassment?

A. Embarrassment and—and disagreement.

Q. And that's what you meant when you said you were hoping that Thompsett would disqualify himself?

A. That's the context of that.

Q. I think you also indicated that you were hoping his testimony wouldn't complicate the trial, which you thought would be for no purpose. Is that a fair statement?

A. It's a fair statement.

concluded that radioactive fallout was a possible or probable cause of the injury to the sheep. (T18–4.)

30. Both answers were evasive in that the questions were phrased generally in the past tense and the answers were pointedly limited to disagreements as of the time of the answers. Such calculated answers were not an inadvertence, but rather an intentional evasiveness. Not only were they unresponsive to the questions asked but the answers themselves were untrue.

31. In a recent affidavit Dr. Veenstra indicates that he never changed his opinion that radiation may have been a contributing cause. Dr. Trum, in a deposition and at the trial of the present action, admitted with some equivocation that as far as he knew Veenstra never changed his position to this effect. There are strong indications in the record that Dr. Thompsett did not actually change his original position despite his deposition testimony and letter to the contrary. The proceedings with respect to the deposition throw further light upon what was going on behind the scenes.

32. Dr. Thompsett was not called as a witness by either side. Why this was so, why the attorneys for plaintiffs were unwilling to call him and why Government counsel did not want him to appear at the trial, become clearer as the model letter is followed into Thompsett's pretrial deposition taken on March 14, 1956, at the Los Alamos Veterinary Hospital at Los Alamos, New Mexico. The deposition according to the reporter's notation was taken "on behalf of the plaintiffs" but their counsel in lieu of the deposition tried unsuccessfully at the outset to negotiate a definite agreement for the production of Dr. Thompsett in Salt Lake City at the time of the trial and, failing this, limited his direct examination to brief authentication of Thompsett's initial report supporting plaintiffs' position. Having done so, and obviously not wishing to make the witness his own on any other matter, plaintiffs' counsel announced that he did not want to continue with the deposition at that time because of the difficulty he had experienced in getting to talk to the witness. Thereupon, Mr. Finn, over the objection of plaintiffs' counsel, had Thompsett identify the later letter as it had been signed by the witness under date of May 23, 1955, and addressed to AEC attorney Chalmer King, a friend of the witness. It no doubt was upon the basis of this deposition and the two letters that were attached to it that the Court was led to the assumption at the trial that Dr. Thompsett in good faith had renounced his original views.

33. The answers to interrogatories in question may not have been prejudicially misleading to plaintiffs in the sense that they avoided answering whether any of the experts had ever believed that radiation was the cause of the injuries to the sheep for the reason that plaintiffs knew already that at least three of them initially held that opinion. A responsive answer may have highlighted favorable aspects of the views of Dr. Wolff which were not pursued at the trial as hereafter noted. The answers were highly deceptive in that they led plaintiffs to believe that those on whom reliance had been placed for making out a prima facie case had now changed their minds in unanimous support of the views of the defendant and discouraged the exploration in depth by plaintiffs of their original opinions by inducing apprehension on the part of plaintiffs' counsel that this would only emphasize the adverse effect of the changed opinions.

34. Both Dr. Holmes and Dr. Wolff had indicated prior to the original trial their views that there was or may have been a causal connection between the fallout and sheep deaths. Dr. Holmes had been maneuvered into the appearance of having concurred in the AEC report of October 1953 to the contrary but thereafter disassociated himself from full concurrence by an internal report within the Public Health Service. He supported the Government's contentions on causation at the trial. Dr. Wolff at all times has been inclined to the view that a causal connection could not be ruled out and so indicated to the Congressional committee. He testified with reference to these matters in the present proceedings as a

witness first called by the Court, neither side being inclined to call him as its own witness.[9]

*Other Claims of Fraud on Court*

35. At the 1956 trial the Court was advised by defendant's representatives, and the expert testimony submitted was with little divergence to the effect that, based upon reliable objective data the knowledgeable experts were unanimous in their opinion that radioactive fallout in no way could have been a contributing cause of any of the sheep losses claimed by the plaintiffs. From the evidence and information now before the Court, it is obvious that such representations were in fact not well founded. Implicit in the position taken by the Atomic Energy Commission at the trial was the representation that its investigation and reporting had been fair, impartial and comprehensive. Such was not the case.

36. Recent reassessments of the internal radiation doses plaintiffs' sheep could have suffered without reference to circumstantial evidence were reported by Dr. Anspaugh of Lawrence Livermore Laboratory, and by Dr. Murphy of Batelle Memorial Institute. The conclusions of both tended to support the position taken by the defendant at the trial as to the limited amount of radiation to which the sheep could have been subjected. Neither undertook to deal with the ultimate issue of cause and effect. The values used in these assessments were various recorded measurements of radiation taken in 1953 in the areas where plaintiffs' sheep were reported to have been trailing and grazing. The values differed substantially from those used and testified to by Dr. Harold Knapp, a former operation analyst in the office of the General Manager of the AEC and an expert of impressive credentials and experience, who had undertaken for the purposes of the Congressional committee a similar reassessment. He questioned basic assumptions of Dr. Anspaugh and Dr. Murphy and concluded on the basis of all available data that there was clearly a causal connection between radioactive fallout and the deaths of plaintiffs' sheep and that circumstances which he reviewed suggested a sophisticated suppression or muting in the course of the

9. Dr. Wolff stated in his letter to the committee among other things:

> In my view the Judge's decision, in a legal sense was correct; there was no strong case that radiation was a causal factor. However, I was never convinced that radiation was not causally involved in view of the circumstantial evidence and the lack of any convincing alternative explanation of etiology.

He testified in the present proceedings:
Q. (by the Court). ... The letter that's been handed me is dated August 20, 1980, and to Mr. Mark J. Rabb, Chief Counsel, Staff Director of the Subcommittee [Exhibit 20]. Is that the letter you last referred to?
A. Yes. . . .
Q. And the summary read into the record by Mr. Bushnell represented your views as of that time within the perimeter of the scope of that letter; is that correct?. . .
A. Yes, sir.
Q. And does it represent within the scope of that letter your present views?. . .
A. Yes, sir.
Q. Then I pass in point of time back to the time of trial. Do you recall having testified at the trial?
A. Yes, I do, very clearly.
Q. Did you express the same view at the time of trial?

A. I do not believe so. I don't believe I was asked my view in that regard because my testimony dealt specifically with the data that I collected on the analysis of tissues for radioactivity, which turned out to be very specifically related to the Shot Harry.
Q. As far as you recall, you were neither asked nor did you express an opinion as to whether there might be some causal connection between the testing and the injury, the sheep involved in that act.
A. To the best of my recollection that is so, your Honor.
Q. Apart from evaluating my decision by inference in the statement quoted, did you entertain essentially as of that time of the trial the same impression you expressed in the statement read into the record of Mr. Bushnell?
A. I believe so. At the time I recall that the data that was presented, insofar as the fallout patterns were concerned, were quite convincing that the radioactive—the levels of exposure were quite likely not to have been sufficiently high to have caused these problems in the sheep. Nonetheless, I had the gnawing doubt that I still have, that there is no satisfactory explanation for the diseases and the symptoms manifest, and that the symptoms were compatible with radioactive fallout.

AEC's investigation of evidence to this effect. While Drs. Anspaugh and Murphy did not dispute Dr. Knapp's general dosage theory or his calculations (formula), nor address the question of suppression, they did question his assumptions (values), and, consequently, his conclusions as to probable dosages, as Dr. Knapp disputed theirs.

37. The dosage studies utilize various and debatable assumptions which materially affect the validity of the respective studies and conclusions that might be based thereon. A weighing of this evidence will be more germane to a retrial of the merits of plaintiffs' case when all of the pertinent evidence can be placed before a court. It is believed inappropriate to express at this time an opinion on how the ultimate merits of the actions should be decided upon any such retrial, and I do not intend to do so. On the issues before me now, however, I find that on the basis of information within the knowledge of the defendant at the time of the original trial it could not have been fairly represented to the Court that injury to at least some substantial number of plaintiffs' sheep could not have been caused by radiation, and that all of the determinative evidence which should have been placed before the Court at the original trial was not made available to it by reason of the improper conduct of the defendant as herein found.

*Attorneys' Involvement*

38. The answers to interrogatories prepared by defendant's attorneys were intentionally evasive and prejudicially misleading as heretofore found. The Court finds that at least one, if not more of the defendant's lawyers was a party to an intentional deception in this respect.

39. Mr. Finn, one of defendant's attorneys hand delivered a copy of the unpub-lished confidential letter from Veenstra, and in general must have been aware of Dr. Trum's maneuverings to achieve unanimity among the expert witnesses at the trial, or their disqualification. Finn knew from that time on that Veenstra's views were being pressured and distorted. Mr. Finn, Mr. King and Mr. Thomas were on reasonable notice that Dr. Thompsett had been subjected to intense pressure from Dr. Trum to change his position, and that any change was the result of that pressure rather than any real alteration of his convictions.

40. Defendant's representatives, including some of its attorneys and Dr. Trum, were familiar with Bustad's research, including his fetal lamb studies.[10] It is clear that the significant support thus provided for plaintiffs' case on the issue of causation could not have been lost upon either Dr. Trum or the Government attorneys knowing about this report. It is also clear that at the trial those attorneys, as well as Dr. Trum and other witnesses for the Government, must have realized how important knowledge of those "applicable" studies might have been in support of plaintiffs' case as they observed the unsuccessful efforts of plaintiffs' counsel to argue the "inapplicability" of the other Bustad studies made available for the Court's consideration and the weight the Court attached to those other studies in ignorance of the fetal lamb studies which strongly supported a different view.

41. At the trial the contention was made by counsel for the plaintiffs that there had been a "cover-up" by the Atomic Energy Commission. The Court in language quoted in Part I indicated that there was no evidence of this and stated in effect that it was unthinkable that in this area vital to human as well as animal well-being any investigators would fail to give their best

---

10. THE COURT: Are you saying then that the relevancy of your experiments at Hanford with regard to fetal lambs was recognized and your data was reported. . . .

THE WITNESS (Dr. Bustad): Yes. . . .

THE COURT: Would that include Dr. Trum and the Attorneys for the United States in the preparation—during the time of the preparation of the defense of this case?

THE WITNESS: As far as making it available to them?

THE COURT: Yes, did you discuss it?

THE WITNESS: Oh, yes.

THE COURT: The significance of or the relevance of your investigation with regard to fetal lambs.

THE WITNESS: I discussed all of our results, sir.

objective opinion if they knew or suspected the possibility of damaging fallout. With the foregoing information known to Government representatives present at the trial and with the knowledge that the distorting pressures and suppressions hereinafter referred to were unknown to the Court, the Government representatives permitted the Court to decide the case without any indication of the information in their possession which would have raised serious question concerning the Court's assumptions of their good faith.

42. The defendant's lawyers participating in the trial again stood silently by as the Court in its oral decision attached substantial weight to the assumed change of opinion of two out of the three experts initially favorable to the plaintiffs' contentions on causation. Nor did any of them prior to the initiation of the present proceedings say or do anything to dispel what must have been known to them as an inaccurate and misled assumption.

43. Other direct evidence of the involvement of defendant's attorneys as officers of the court in a program of suppression and diversion is limited and the fixing of overall responsibility upon any particular lawyer likely impossible. No doubt some acted in good faith, having only insignificant glimpses of the total pattern. Yet, it appears clearly and convincingly from all of the circumstances of the litigation as they now appear, and I find, that one or more of defendant's attorneys knowingly participated in a program for the concealment from the Court of facts which he or they knew or in good conscience should have known the Court was entitled to have placed before it in order properly to rule upon the determinative issues of the case.

*Limitations and Laches*

44. Following the 1956 trial, plaintiffs took no action to investigate the charges of "cover-up" made against the Government, until about February 16, 1979, when they or their representatives participated in the Congressional hearings and investigations heretofore mentioned. Plaintiffs did not file their action and motions claiming fraud upon the court until February 1981.

45. Prior to January 1955 plaintiffs' counsel obtained a file from the Las Vegas Field Office of the AEC containing documents relating to the AEC investigation of plaintiffs' sheep deaths. The file contained the initial reports of Drs. Veenstra and Thompsett. Consequently, plaintiffs had actual knowledge, through documents produced by defendant that at least initially there were opinions expressed by Drs. Veenstra and Thompsett concluding that radiation had contributed to the sheep deaths and it may also be inferred that prior to the trial they knew of similar views initially entertained by Dr. Holmes.

46. Counsel for plaintiffs in considering the replies to interrogatories, some of which were unresponsive as earlier noted, accepted the answers of the Government and on their basis came to believe that Holmes, Thompsett and Veenstra had, indeed, changed their positions from those theretofore supportive of plaintiffs' contentions on causation to opinions adverse to them. Counsel for plaintiffs did not either at the trial or by discovery fully test the reasons or details of these changes apparently because of their apprehension that by so doing they would weaken or destroy their reliance upon earlier statements to support their prima facie case.[11]

11. All counsel were on notice that the Court expected a full exploration of changes in the opinions of experts since it stated at a pretrial conference shortly before the trial:

> THE COURT: Furthermore, you gentlemen expressed the thought that you need [at the trial] some of this, these statements, because it might indicate some factors you couldn't establish from the witnesses themselves.... I'm not too much impressed with the idea

> because I apprehend that when we get through with this case we will face all these reports. That is the way I feel about it, Mr. Thomas ... and we are going to come up with an end result not based technically about the first impression or even the last impression, but a balancing of them all.... Transcript of pretrial hearing Aug. 31, 1956, at 13–14.

## III  DISCUSSION

On this record I can find no broad ulterior conspiracy, no centralized planning in high places, no corruption in the ordinary sense of the term, no overt violation of law (although pressure upon witnesses to testify favorably to the Government or not to testify at all smacks of an endeavor to influence witnesses proscribed by 18 U.S.C. § 1503), no motive for personal gain, nor any other ultimate purpose than to advance the perceived interests of the United States in the unimpeded testing of nuclear weapons and to prevent this program from being needlessly interfered with or embarrassed by judicial action. But the improper means by which this purpose was sought to be achieved are in my opinion unacceptable as a part of the judicial process.

There are circumstances which render the case far from an easy one, not the least of which is the long interval of time with which we have had to cope. There are resulting imponderables in addition to the unavailability of a complete trial record. There could be a temptation to treat present-day cynicism concerning the good faith of government officials as always having existed. Much has happened during the last decade or so to alter public opinion. Ideas of what conduct of investigators, witnesses and officers of the court is acceptable in the course of the judicial process may have changed, hopefully for the better, as we get further and further away from the idea of mere gamemanship in the operation of the adversary system.[12] The intervening years between the original trial and the present have no doubt brought new perceptions in the light of which it would be unfair to nicely evaluate conduct and attitudes in the 50's, or inappropriate to assume, as some courts have viewed new substantive concepts, that current ethical or moral standards for litigation have always existed. And it is quite true that judged by modern insights I took a somewhat pristine

view at the original trial of the general integrity of government officials in the absence of evidence impugning it in specific instances. I suppose that I shall continue to do so, despite the buffetings of Watergate, these proceedings and other current disclosures. Nonetheless, I have concluded that by whatever standard or as of whatever period the circumstances found here are to be judged, they clearly and convincingly demonstrate a species of fraud upon the court for which a remedy must be granted even at this late date.

Fraud upon the court is a nebulous concept, *Wilkin v. Sunbeam Corporation,* 466 F.2d 714 (10th Cir. 1972). It of course need not fall neatly into a pattern of common law or securities fraud, nor be accomplished by any single means or in any particular way for, as in the instance of other similar concepts, precise definition should not supply to transgressors a convenient map for avoidance. But it is that species of fraud which does, or attempts to, defile the court itself or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its important task of adjudicating cases that are presented for adjudication. *Hazel-Atlas Co. v. Hartford Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). *See also* 7 Moore's Federal Practice (2d ed.) ¶ 60.33 at 515. Both Moore, *Id.* at 512–13, and *Wilkin*[13] at 717, suggest that *Hazel-Atlas* expanded the traditional fraud on court concept. The defendant has cited cases, including *Wilkin,* to emphasize the strong public policy supporting the finality of judgments and indicating that even perjury, false answers to interrogatories, or new evidence in and of themselves will not warrant their being set aside in ordinary circumstances. I do not regard any of them as persuasive against plaintiffs' contentions in the virtually unprecedented circumstances shown by the present record and believe that they

12.  *See, e.g.,* Frankel, *The Search for Truth: An Umpereal View,* 123 U. Pa. L. Rev. 1033 (1975).

13.  In *Wilkin* the claims of fraud upon the court were rejected on the grounds that documents in question had been held by the district court

to be irrelevant and immaterial to the issues and the lawyers statements complained of depended upon a credibility issue which the trial court resolved against the plaintiff.

must yield here to broad application of principles to be gathered from *Hazel-Atlas.*

The present is not an ordinary case with mere private or even ordinary public concerns. It originated amid a transcendent chapter of world history, developing but imperfect information concerning a mysterious and awesome device as to which the AEC and those associated with it enjoyed a virtual monopoly of knowledge in comparison to that independently available to the plaintiff sheep owners, their attorneys and, indeed, the Court, and a variated and persistent program of government representatives to disclose only selectively the information fairly necessary in the prospective judicial proceedings.

█ In such a setting it appears by clear and convincing evidence, much of it documented, that representations made as the result of the conduct of government agents acting in the course of their employment were intentionally false or deceptive; that improper but successful attempts to pressure witnesses not to testify as to their real opinions, or to unduly discount their qualifications and opinions were applied; that a vital report was intentionally withheld and information in another report was presented in such a manner as to be deceitful, misleading, or only half true; that interrogatories were deceptively answered; that there was deliberate concealment of significant facts with reference to the possible effects of radiation upon the plaintiffs' sheep; and that by these convoluted actions and in related ways the processes of the court were manipulated to the improper and unacceptable advantage of the defendant at the trial.[14] Relief should be granted upon these findings unless for some reason it is barred by the doctrine of laches.

The question of laches is not to be lightly dismissed, although obviously in this court

of equity the defense of the statute of limitations is without merit. It is contended that plaintiffs were at fault in not delving more deeply or quickly into the matters of which they now complain.

Though it might be thought that even before the time of the Congressional hearings plaintiffs may have had notice of questionable circumstances sufficient to have placed a reasonable person on inquiry under the ordinary standards governing statutes of limitations for fraud actions generally, and granted, too, that a lack of diligence of private parties under some circumstances should weigh upon the judgment of a court in considering the granting of the extraordinary relief sought here (as it has), I have concluded that there has been no laches of a character to bar relief.

█ The defendant has emphasized in its other arguments the unusual nature and strong proof essential as prerequisites to any justified action for fraud upon the court; by the same token perhaps neither the Court nor the defendant should be unduly impatient because plaintiffs awaited the assembling of what could be thought to be weighty and convincing evidence before actually filing their charges. Nor does it lie with the Government to say that the plaintiffs, not to mention the Court, should have known better than to fall victim to the deceptions practiced or move more promptly in rectifying them. A court should not permit the very effectiveness of a party's improper tactics, nor even the lack of diligence of private parties, given a case of fraud on the court, to bar it from considering at any time the public interest and the imperative of safeguarding the judicial process and the court as an institution. As was stated in *Hazel-Atlas:*

> But even if Hazel did not exercise the highest degree of diligence, Hartford's

14. *Cf. Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1346 (5th Cir. 1978) in which the court said:
> Through its misconduct in this case Ford completely sabotaged the federal trial machinery, precluding the "fair contest" which the Federal Rules of Civil Procedure are intended to assure. Instead of serving as a vehicle for ascertainment of the truth, the

> trial in this case accomplished little more than the adjudication of the hypothetical fact situation imposed by Ford's selective disclosure of information. The policy protecting the finality of judgments is not so broad as to require protection of judgments obtained in this manner.

fraud cannot be condoned for that reason alone. This matter does not concern only private parties. There are issues of great moment to the public.... Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than injury to a single litigant. It is a wrong against the institution set up to protect and safeguard the public institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agents of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

322 U.S. at 246, 64 S.Ct. at 1001.

The facts, circumstances and inferences stated in the foregoing Part III Discussion and Part I Memorandum are intended where appropriate to constitute additional findings of fact in supplementation of Part II for the purposes of Fed.Civ. Rule 52(a).

### IV  CONCLUSIONS OF LAW

From the foregoing Findings of Fact, the Court now makes the following Conclusions of Law:

1. That it has jurisdiction over the subject matters of these proceedings and over the parties, and particularly that as a court of equity and by reason of Fed.R.Civ.P. 60(b) it has jurisdiction and authority to grant the relief sought by the plaintiffs.

2. That defendant perpetrated a fraud upon the court for the reasons hereinabove stated.

3. That neither plaintiffs' suit to vacate the judgments in question nor the relief hereby granted is barred by laches or any statute of limitations.

4. That the judgment in the Bulloch action tried in 1956 should be vacated.

5. That the tried action in effect involved all of the other above-entitled actions, that the same justification and imperative for the setting aside of the judgment in that case apply to each of the others and that the judgments in all of them should be similarly treated.

6. That plaintiffs are entitled to costs of the present proceedings.

7. That new trials should be had in all of these actions.

8. Plaintiffs are directed to serve upon defendant and submit to the Court within ten days from the date hereof a proposed form of judgment in harmony with the foregoing findings of fact and conclusions of law, as to which the Court will welcome defendant's suggestions or corrections without considering them in any way to be a waiver of contentions in these proceedings.

9. This case is set on August 24, 1982, at the hour of 11 o'clock a.m., for settlement of the form of judgment.