# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2031

_____

| | | |
|---|---|---|
| Superior Seafoods, Inc.; | * | |
| Superior Seafoods, L.L.C.; | * | |
| Quality Finer Foods, Inc., | * | |
| | * | |
| Plaintiffs-Appellants, | * | |
| | * | |
| Louis E. Kemp, | * | Appeal from the United States |
| | * | District Court for the |
| Plaintiff, | * | District of Minnesota. |
| | * | |
| v. | * | |
| | * | |
| Tyson Foods, Inc.; ConAgra Grocery | * | |
| Products Company, L.L.C., | * | |
| | * | |
| Defendants-Appellees. | * | |

_____

Submitted: February 9, 2010
Filed: September 3, 2010

_____

Before WOLLMAN, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

This case is the latest in a series of trademark-related actions stemming from Plaintiff Louis Kemp's sale of a seafood-products business to Oscar Mayer.[1]  In one of the earlier cases, the district court[2] entered a consent judgment disposing of several issues prior to a bench trial.  The present case, filed more than five years later and after several foregone opportunities to challenge the consent judgment, is an independent equitable action seeking relief from the consent judgment pursuant to Federal Rule of Civil Procedure 60(d).  In this action, Mr. Kemp alleges that he entered into an underlying consent agreement by mistake and that the resulting consent judgment was the product of fraud on the court.  The district court granted summary judgment against Mr. Kemp, and we affirm.

I.      Background

Mr. Kemp built a seafood business and sold it to Oscar Mayer.  Through subsequent transfers, the business is now owned by Con Agra Grocery Products, L.L.C.[3]  At the time Mr. Kemp sold the business, he had used variations of trademarks based upon his last name on surimi seafood products and owned federal registrations based upon his use in commerce of the marks KEMP, KEMP'S, and KEMP'S & DESIGN.  In a stock purchase agreement governing the initial sale of the business, Mr. Kemp warranted that there had been no other use of the marks on any other products.  Pursuant to the stock purchase agreement, Mr. Kemp sold all trademark

---

[1]In a prior appeal, we identified several of the other cases.  See Kemp v. Bumble Bee Seafoods, Inc., 398 F.3d 1049, 1052 n.3 (8th Cir. 2005).

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[3]We refer to Louis Kemp and the various aligned entities that he has worked for, or held an ownership interest in, as Mr. Kemp.  We refer to Oscar Mayer, Tyson, Con Agra and all other entities following in the chain of succession from Oscar Mayer (the original buyer of Louis Kemp's business) collectively as Con Agra.

rights developed through his actual use of KEMP-related marks in commerce. Further, Mr. Kemp agreed that he would not initiate any new uses other than marks that included the word KEMP preceded by one or more words with the additional words subject to approval in advance by Con Agra.[4]

In an amendment to the stock purchase agreement signed two years later, Mr. Kemp expressly "granted" to Con Agra the right to use the mark LOUIS KEMP on seafood and related products in a "natural zone of product line expansion."[5]  The

---

[4]The agreement provided:

Seller represents and warrants that Seller or any entity in which Seller has an interest (except for Company) has never engaged and is not presently engaged in marketing, selling, or otherwise distributing at retail any product bearing the name KEMP, KEMP's, KEMP'S & DESIGN or any variation thereof except as disclosed and described in Exhibit 35 attached hereto.  Seller agrees that neither Seller, nor any entity in which Seller has an interest, shall in the future market, sell or otherwise distribute any product except as provided in Section 7.6 and 7.7 or any other food or beverage product either at wholesale or retail bearing the name KEMP, KEMP's, KEMP's & DESIGN or any variation thereof.

In Section 7.6, Mr. Kemp agreed without qualification to stop selling "any products" using the marks within nine months.  Section 7.7 granted Mr. Kemp the right to distribute certain products "bearing a composite trademark consisting of the word KEMP or KEMP's and preceded by one or more additional words the selection of which shall be approved in advance in writing by Buyer."

[5]The amendment again provided that Mr. Kemp, on certain products, could "utilize a composite trademark consisting of the word KEMP or KEMP's and preceded or followed by one or more additional words . . . approved in advance in writing by Buyer."  The amendment also provided, in part:

Seller grants to Buyer (a) the right to use and register the mark LOUIS KEMP, any design marks incorporating LOUIS KEMP and/or LOUIS

agreement, however, contained no acknowledgment by Con Agra that Louis Kemp actually possessed any such rights to grant. Mr. Kemp alleges that, initially, Con Agra orally agreed to allow him to use the mark LOUIS KEMP broadly. As quoted above, this sentiment is not expressed in the written amendment to the stock purchase agreement.

Mr. Kemp then initiated his own use of a LOUIS KEMP mark on wild rice products. Mr. Kemp initiated this use without seeking advance approval from Con Agra as required by the amendment and the stock purchase agreement. Eventually, Mr. Kemp and Con Agra found themselves embroiled in litigation in California and Minnesota. Mr. Kemp asserted that Con Agra obtained only limited rights through the agreement and the amendment, and Con Agra asserted that Mr. Kemp's use of the mark LOUIS KEMP was an unapproved, infringing use. Litigation included trademark, contract, business-tort, and declaratory judgment claims as well as a bankruptcy by Mr. Kemp in California.

In 1999, prior to trial in Minnesota, the parties reached a settlement regarding all of the California cases and dismissed with prejudice all of Mr. Kemp's claims against Con Agra in California. The parties then negotiated a consent agreement over the course of approximately twenty months to pare down the issues remaining for trial in Minnesota. It became apparent in negotiations over the consent agreement that Mr. Kemp wanted any such agreement to state that Con Agra's right to use the LOUIS KEMP marks was limited (1) narrowly to surimi and related products, or (2) in accordance with consents and assignments as contained in the parties' earlier agreements. Con Agra did not want such language included and stated in an early draft of a consent agreement that Con Agra owned "all right title and interest in and to the marks."

---

KEMP SEAFOOD COMPANY in the United States and elsewhere for surimi-based seafood products and such other seafood and fish accessory products within the natural zone of product line expansion . . . .

-4-

Taken in a light most favorable to Mr. Kemp, it is fair to say Con Agra's attorney's were deceptive and evasive in their communications with Mr. Kemp's attorney and with the district court in interactions leading up to the court's issuance of an order on March 31, 2001. For example, in one instance, a Con Agra attorney sent a revised draft consent agreement to Mr. Kemp's attorney stating the revisions "incorporated" Mr. Kemp's concerns. In fact, the revisions only addressed some of Mr. Kemp's concerns. In another instance, attorneys for Con Agra submitted to the court an early draft of the consent agreement that was signed by Mr. Kemp's attorney and asked the court to enter an order enforcing the early draft of the agreement. Attorneys for Con Agra, however, knew at the time that Mr. Kemp had not approved that specific draft of the agreement because Mr. Kemp had specifically rejected that draft and the parties subsequently had negotiated for months to formulate mutually acceptable language.

In the March 31, 2001 order, however, the court noted that the parties had not submitted a signed consent agreement. The court also indicated that Con Agra had acquired from Louis Kemp "only a limited right to use and register LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY in connection with surimi based seafood and related products." The court noted that the parties had not yet reached agreement as to the propriety of dismissing declaratory judgment claims regarding the parties' relative rights in the LOUIS KEMP marks. Accordingly, although Mr. Kemp now cries foul regarding actions by Con Agra's attorneys leading up to the March 31, 2001 order, that order, in and of itself, does not contain the statements Mr. Kemp alleges to be adverse to his purported interests.

Ultimately, negotiations continued and Mr. Kemp's attorney signed a May 16, 2001 version of a consent agreement that did not include Mr. Kemp's desired language describing Con Agra's rights in the LOUIS KEMP marks as being limited. There is no allegation that Mr. Kemp's attorney or Mr. Kemp were deceived regarding the contents of the document signed in May 2001. Mr. Kemp's attorney submitted this

version of the consent agreement to the court, along with a cover letter stating that the agreement was "subject to the Court's [March 31, 2001] Decision and Order . . . that 'the defendants acquired only a limited right to use and register LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY in connection with surimi-based seafood and related products.'" Before signing the document and submitting it to the district court, Mr. Kemp's attorney consulted with Mr. Kemp and told Mr. Kemp that, although the agreement did not contain the desired language, he nevertheless recommended accepting the agreement. The attorney also told Mr. Kemp that a reference to limited rights in the cover letter would be equivalent to placing such language in the consent agreement. The consent agreement expressly disposed of remaining declaratory judgment claims and left for trial only infringement, dilution, and unfair competition claims against Mr. Kemp. The district court entered a consent judgment based on the consent agreement.

In later May 2001, shortly after the court entered the consent judgment, counsel for Con Agra sent a letter to Mr. Kemp's attorney and to the court noting that the March 31, 2001 order preserved the declaratory judgment claims whereas the subsequent consent judgment disposed of such claims. The letter emphasized that only the infringement, dilution, and unfair competition claims against Mr. Kemp remained for trial. In response, Mr. Kemp and his attorneys did not protest to the court or suggest there was error or fraud surrounding the consent judgment.

The court subsequently held a bench trial on the remaining claims and ruled in favor of Mr. Kemp. Con Agra appealed. While the appeal was pending, Con Agra introduced a line of smoked salmon products under the LOUIS KEMP trademark. Mr. Kemp sought an injunction to stop this new use. The district court, in a March 30, 2004 order relying in part on the language of the consent judgment, stated the consent judgment was "unambiguous and simply cannot be read to include the possibility that the scope of [Con Agra's] marks continued to be limited to surimi-based products. If such a limitation was intended, it should have been included in the Consent Order."

In February 2005, we reversed the district court's ruling from the bench trial in the infringement action against Mr. Kemp and found infringement of Con Agra's marks based on Mr. Kemp's use of LOUIS KEMP-related marks on the wild-rice and side-dish products.

Mr. Kemp did not attack the May 2001 consent judgment after the court in the injunction proceedings relied on the consent judgment and referred to Con Agra's rights as not limited to surimi-based products. Mr. Kemp did not attempt to vacate the consent judgment during his infringement trial or in his appeal to our court in the infringement case. Finally, on June 20, 2006, Louis Kemp for the first time sought to vacate the consent judgment by filing the present action.

The district court in the present action granted summary judgment in favor of Con Agra, finding that Kemp's attorney had carefully reviewed the consent agreement prior to signing in May 2001 and had advised entering into the agreement even though he would have preferred different language. The district court noted that the parties had negotiated extensively over the specific issues Mr. Kemp raises in this action for relief—the scope of relative rights in the LOUIS KEMP marks—and that even if there had been deceptive actions directed towards the attorneys, there had been no fraud on the court itself. Finally, the court noted that Mr. Kemp was not without fault and therefore was not entitled to equitable relief. The court reiterated that Con Agra's attorney, in its letter to the court in May 2001, drew attention to the inconsistencies between the March 2001 order and the May 2001 consent judgment. The court also noted that Mr. Kemp and his attorneys had taken no actions to challenge the consent judgment in response to this notice.

II.     Discussion

        A.     Rule 60

Rule (60) "does not limit a court's power to: . . . (3) set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d). Rule 60(d) was added to the Federal Rules in 2007, but before that time, Rule 60(b) contained a savings clause referencing the same avenue of relief. See Fed R. Civ. P. 60(b) (2006). We long ago recognized the type of independent action referenced in these rules. See, e.g., Nat'l Surety Co. v. State Bank, 120 F. 593, 599 (8th Cir. 1903) (describing elements for an independent cause of action to obtain relief from a prior judgment); see also Griffin v. Fed. Deposit Ins. Corp., 831 F.2d 799, 802 (8th Cir. 1987) (describing the savings clause of Rule 60(b) as providing for an independent cause of action similar to the cause of action described in Nat'l Surety). In Nat'l Surety, we stated:

> The indispensable elements of such a cause of action are (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law.

Nat'l Surety Co., 120 F. at 599. We have subsequently emphasized that fraud on the court is distinct from mere fraud upon a party. See United States v. Smiley, 553 F.3d 1137, 1144 (8th Cir. 2009) ("Fraud on the court which justifies vacating a judgment is narrowly defined as 'fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury.'") (quoting Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985)); Heim v. Comm'r, 872 F.2d 245, 249 (8th Cir. 1989) (John R. Gibson, J., writing separately) ("The cases that recognize such a theory, however, have been careful to differentiate fraud on the court from fraud against individuals."). Further, relief is only available

-8-

where it would be "manifestly unconscionable" to allow the judgment to stand. Griffin, 831 F.2d at 802; Middleton v. McDonald, 388 F.3d 614, 618 (8th Cir. 2004). Relief through an independent equitable action alleging fraud on the court, then, is a truly extraordinary form of relief.

Although this appeal is from a grant of summary judgment, our review is not de novo. Rather, in this equitable action for relief from a prior judgment, we review only for a clear abuse of the district court's considerable discretion. See Greiner v. City of Champlin, 152 F.3d 787, 789 (8th Cir. 1998) (applying the abuse of discretion standard upon review of a denial of relief in an independent action to disturb a prior judgment); Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003) (applying the abuse of discretion standard rather than the typically applicable de novo standard to review a dismissal for failure to state a claim under Rule 12(b)(6) where the cause of action was an independent equitable action seeking to disturb a prior judgment). The extraordinary relief afforded pursuant to Rule 60(d) is more difficult to obtain than relief that might be available through a timely Rule 60(b) motion, but it remains the same type of relief—relief from an otherwise final judgment. We review the disposition of a timely Rule (60)(b) motion only for an abuse of discretion, unless the dispositive issue is purely one of law. See Jones v. Swanson, 512 F.3d 1045, 1048 (8th Cir. 2008) ("Generally, we review a district court's denial of a Rule 60(b) motion for a clear abuse of discretion. . . . [Where] denial was based on purely legal grounds, [however], we review the dismissal de novo."). We do not believe it would be appropriate to afford less deference to the considered judgment of the presiding court in the context of a later-filed independent equitable action seeking the same type of relief.

Application of the abuse-of-discretion standard is particularly appropriate in this case because the presiding judge from the underlying matter is the same judge who considered the present Rule 60(d)(3) request for relief. This judge not only had a front-row seat for, and personal involvement in, the underlying matter, but he

expressly drew upon his personal knowledge and stated in his ruling that he was not defrauded by any of the alleged instances of malfeasance.

Here, for several reasons, Mr. Kemp falls far short of the exacting standards for after-the-fact equitable relief. First, we cannot characterize Mr. Kemp as being without fault given the multiple foregone opportunities to raise his current arguments. There was no newly discovered information brought to light after entry of the consent judgment, and, in May 2001, counsel for Con Agra notified the district court of the difference between the consent judgment and the March 2001 order. Mr. Kemp did not seek to vacate the consent judgment after receiving that letter or at any time during the subsequent bench trial or in the appeal following that bench trial.

Further, the district court subsequently relied upon the consent judgment in March 2004 in a manner that was arguably adverse to Mr. Kemp's position when it denied Mr. Kemp's request for an injunction against Con Agra's use of the LOUIS KEMP marks on salmon products. There, the court characterized the consent judgment as clear and characterized Con Agra's rights in the LOUIS KEMP marks as not being limited to surimi-related products. If Mr. Kemp and his attorneys were truly unaware of the allegedly adverse impact of the consent judgment prior to March 2004, the district court's reliance on the order in this manner should have clarified any lingering misunderstanding. Still, Mr. Kemp did not attack the consent judgment as fraudulent or as the product of a mistake. Given these facts, and given the equitable requirement that the party seeking relief be free from negligence and fault, Griffin, 831 F.2d 802–03, the district court clearly did not abuse its discretion in finding equitable relief inappropriate in this case.

Second, the district court expressly held that it had not been defrauded. In this regard, we note that the district court's March 2001 order expressly held that the parties were not in agreement as to their relative rights in the LOUIS KEMP marks and reserved the parties' declaratory judgment claims related to this issue. Many

instances of alleged malfeasance that Mr. Kemp cites in support of his current action are based upon actions by Con Agra's attorneys that preceded the March 2001 order. That order, however, did not contain the alleged infirmity that Mr. Kemp now complains of, namely, a purportedly incorrect overstatement of the extent of Con Agra's rights. Events preceding the March 2001 order, then, clearly did not amount to fraud on the court.

The parties then negotiated further and delivered to the court an agreement, signed by counsel for both parties, stating that the parties agreed to dismissal of the declaratory judgment claims and describing Con Agra's rights in the LOUIS KEMP marks as broad, rather than as limited. Mr. Kemp's attorney, not Con Agra's attorney, delivered this agreement to the court. Mr. Kemp's attorney had signed the agreement, and had explained the contents of the agreement to Mr. Kemp. From the district court's perspective, the previously undecided declaratory judgment issues concerning the parties' relative rights in the LOUIS KEMP marks were, at that time, resolved. The May 2001 consent agreement that Mr. Kemp's attorney submitted to the court stated this expressly, as did the follow-up letter from counsel for Con Agra.

Although Mr. Kemp now argues that the attorneys for all parties were mistaken in their understanding of the negotiated document and, in the alternative, that counsel for Con Agra misled Mr. Kemp's attorney in the final negotiations, Mr. Kemp fails to explain how these allegations rise to the level of fraud on the court. See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 538 F.2d 180, 195 (8th Cir. 1976) ("A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel and must be supported by clear, unequivocal and convincing evidence.") (internal citations omitted); Heim, 872 F.2d at 249 ("The cases that recognize such a theory, however, have been careful to differentiate fraud on the court from fraud against individuals."). The court entered its consent judgment based on the written document provided by the parties after extensive negotiation, and the

court was not required to look behind or interpret that written document to ensure that the meeting of minds reflected therein was not, in fact, against the wishes of Mr. Kemp and his attorney.

The district court properly denied Mr. Kemp's belated request for extraordinary relief, and we affirm the well-reasoned judgment of the district court.[6]

_____

[6]To the extent Mr. Kemp's disagreements are with his attorneys and the advice they provided, or to the extent he argues his attorney signed the consent agreement against his wishes in May 2001, the proper avenue for relief is a proceeding involving his attorneys rather than an attack upon a five-year-old judgment. Mr. Kemp's attorney was plainly authorized to negotiate on Mr. Kemp's behalf, and he informed Mr. Kemp of the negotiations, made recommendations, and represented Mr. Kemp in the trial of limited issues after entry of the consent judgment. This is not a situation where an attorney disposed of a case and disappeared, acted wholly without authority, or deprived a client of the opportunity to protest the attorney's actions directly to the court in the underlying matter. See Heim, 872 F.2d at 247–48; Surety Ins. Co. v. Williams, 729 F.2d 581 (8th Cir. 1984). We make no comment regarding the merits of any claims by Mr. Kemp against his attorneys.